IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ASHCRAFT and ASHLEY
ASHCRAFT, on their own behalf and on behalf
of their minor children, A.A., L.A., and I.A,

Plaintiffs,

v.

SCOTT GOREN and BECKY VANDERLOOP,

Defendants.

Civil Action No.:

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Timothy Ashcraft ("Major Ashcraft") and Ashley Ashcraft, as and for their

complaint against Defendants Scott Goren and Becky Vanderloop, hereby allege on behalf of

themselves and their minor children A.A., L.A., and I.A., based on knowledge as to their own

conduct, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This action arises from Defendants' negligence, carelessness, recklessness, and

indifference in their ownership, management, maintenance, repair, and operation of the property

located at 17 Rustic Ridge, Mountainville, New York 10930 (the "Residence").

2.     The Ashcrafts were victims of the negligence and inaction of their landlords in

maintaining a safe and habitable property while they raised their family and served our country.

Other servicemembers and their families have recently started seeking relief from the damages

these landlords have inflicted in the federal courts,[1] and Plaintiffs Major Ashcraft and Ashley Ashcraft seek that same relief now for the sake of themselves and their children.

3.      Plaintiffs were tenants of the Residence operated by Defendants, Scott Goren and Becky Vanderloop, and resided there along with their minor children A.A., L.A., and I.A. from June 2016 until January 2019.   As a result of Defendants' actions—or lack thereof—severe problems, including a toxic mold infestation, rendered the Residence uninhabitable, constructively evicted Plaintiffs from the Residence, and forced them to destroy their contaminated personal property.  Plaintiffs have suffered extensive financial damages and, more seriously, severe and permanent ongoing personal injuries and illnesses as a result of Defendant's conduct.

4.      In or around September 2018, Plaintiffs were alerted to the likelihood that there was toxic mold in the Residence when the physician treating their children connected their ongoing symptoms to toxic mold exposure.

5.      In December 2018, the existence of toxic mold in the Residence was confirmed by licensed mold inspectors and remediators.  The Residence was declared hazardous and Plaintiffs were forced to vacate the property and seek medical attention as a result of their daily exposure to toxic mold.

6.      As Defendants were well aware,  the mold infestation in the Residence resulted from water leaks, improper maintenance, and faulty roof repairs made to the property. Notwithstanding Plaintiffs' repeated demands made and concerns raised to Defendants for repairs and Defendant's actual knowledge of the ongoing maintenance problems at the Residence, Defendants refused to take appropriate and adequate actions to remedy the underlying problems

---

[1]   *See, e.g., Daniels et al v. AETC II Privatized Housing, LLC et al*, W.D. Texas, filed Oct. 29, 2019, Case No. 5:19-cv-01280; *Lenz et al v. The Michaels Organization et al*, M.D. Florida, filed December 2, 2019, Case No. 8:19-cv-02950.

and remediate the toxic mold.  As a result, the Residence became uninhabitable for Plaintiffs and their children.

7.    Moreover, Defendants were negligent and careless in their "do-it-yourself" treatment to remediate the toxic mold, causing further health damage and contamination to Plaintiffs' personal belongings which remained in the Residence.

8.    Defendants had a legal and contractual responsibility to provide for the maintenance, management and habitability of the Residence.  Defendants' negligent and willful denial of their legal and contractual obligations to Plaintiffs caused the property damage and personal injuries Plaintiffs and their children have suffered.

9.    Defendants also are liable for punitive damages as they have known, or should have known, for at least three years that the dreadful conditions they created and permitted allowed for toxic mold to infest the Residence.  Over many months, Defendants continued to refuse to take timely and necessary measures to prevent or adequately remedy the hazardous conditions.  Rather, they have recklessly and in bad faith acted with indifference and repeatedly refused to acknowledge their negligence in maintaining the Residence, despite the fact that their inaction resulted in serious health issues for Plaintiffs and their three young children.

10.    These conditions constructively evicted Plaintiffs from the Residence, in violation of the Servicemembers Civil Relief Act, a federal statute designed and implemented to help and protect active duty servicemembers—and their families—during their periods of military service by, among other things, easing financial burdens related to security deposits, rent, evictions, and associated civil judicial proceedings.

## THE PARTIES

11.    Plaintiff Timothy Ashcraft is a Major in the United States Army on active duty. Major Ashcraft and his wife Ashley Ashcraft currently reside at Fort Leavenworth, Kansas, where

Major Ashcraft is stationed. Major Ashcraft has served in the United States Army since 2003. He is a combat veteran, serving two deployments to Afghanistan.

12.     Upon information and belief, Defendants Scott Goren and Becky Vanderloop are believed to currently reside in Cape Coral, Florida.

13.     Upon information and belief, Defendants own SB Merchant Services, Inc., a payment processing company based in Newburgh, New York.  Plaintiffs' rent and security deposit was deposited into a bank account controlled by SB Merchant Services, Inc.

14.     At all times relevant to this Complaint, Defendants owned the Residence located at 17 Rustic Ridge, Mountainville, New York 10930.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under Title 28, United States Code, Section 1332(a)(1).  Complete diversity exists among the parties, because Plaintiffs reside in Kansas and Defendants reside in Florida.   In addition, the amount in controversy requirement is satisfied because Plaintiffs' damages exceed $75,000.

16.     This Court also has subject matter jurisdiction over this action under Title 28, United States Code, Section 1331, because one of Plaintiffs' claims for relief arises under a federal statute, the Servicemembers Civil Relief Act ("SCRA"), Title 50, United States Code, Section 3951 *et. seq.*

17.     This Court has personal jurisdiction over Defendants, and venue is appropriate in this District, because Defendants regularly conduct business in the state of New York, derive substantial revenue through that business, and the Residence is located in New York.

## STATEMENT OF FACTS

18.    In early 2016, Plaintiffs were notified that they would be receiving Permanent Change of Station orders to report to West Point.  They had previously been living in Arizona upon Major Ashcraft's return from Afghanistan.

19.    For a servicemember moving to a new installation upon receiving orders, the first priority is to begin the new assignment as expeditiously as possible.  For servicemembers relocating across the country or from overseas, it is often challenging to meaningfully review housing options at the new duty station before arriving on base.  This is what happened to Plaintiffs upon their move to West Point.

20.    Plaintiffs identified the Residence on the Automated Housing Referral Network, a commonly-used housing directory for the military. The Residence is a three bedroom log cabin, located on a quiet street approximately a twenty minute drive from West Point.

21.    During the initial walkthrough of the Residence, Defendants told Plaintiffs they would re-stain and re-seal the logs to prevent excessive moisture from infiltrating the home.

22.    Also during the initial walkthrough of the Residence, Defendants informed Plaintiffs that the basement would get exceptionally damp if a dehumidifier was not run continuously.   Defendants provided Plaintiffs with a dehumidifier which Plaintiffs ran continuously during their occupancy of the Residence.

23.    Because of the unique time pressure to find a home for their family and comply with military orders, and in reliance of Defendants' promises to remedy conditions conducive to the growth of mold, Plaintiffs signed a lease for the Residence on June 16, 2016.

A.   **Mold Growth and Its Effects**

24.     Upon information and belief, molds are part of the natural environment, and can be found both indoors and outdoors.  Molds can grow on virtually any organic substance such as paper, cloth, wood, plant material, and even soil.

25.     Upon information and belief, molds reproduce by means of tiny spores, which are invisible to the naked eye and transported through the air.  If the spores land on a wet surface indoors, mold can grow.

26.     Upon information and belief, in a dwelling, sinks, bathroom tile and grout, basement walls, and areas around windows are common sites for mold growth if proper care is not maintained.  Roof leaks, condensation due to high humidity or cold spots in a building, leaky plumbing fixtures, and flooding water are common sources of moisture that can promote mold growth.

27.     Upon information and belief, under certain conditions, some molds may produce potentially toxic byproducts called mycotoxins.  These molds can be found in dwellings with moisture or water damage.  Dwellings made of porous, exposed wood, such as log cabins, are particularly susceptible to mold growth.

28.     Upon information and belief, the adverse effects of molds on humans and animals can include infections, allergic or hypersensitivity reactions, irritant reactions, and toxic reactions. Allergic responses such as sneezing, runny nose, red eyes, and skin rash are common.  Mold can trigger episodes in asthmatic individuals and can also cause lung disease and neurological damage.

29.     Upon information and belief, mold can infect and cling to any porous materials, including almost all types of personal property.  When contaminated with mold, personal property must be destroyed to prevent spreading mold and infecting additional persons.  Damage from mold on the human body can last a lifetime.

B.     **Plaintiffs Move into the Residence**

30.     In reliance on Defendants' promises to perform the aforementioned maintenance on the Residence to inhibit the growth of dangerous mold, and in recognition of their need for immediate housing to comply with military orders, on June 16, 2016, Plaintiffs entered into a lease with Defendants to rent the Residence.

31.     The same month Plaintiffs moved into the Residence, June 2016, the lack of maintenance on the Residence's logs and deficient repair of water leaks caused conditions ripe for the growth of harmful mold.

32.     In June 2016, Plaintiffs informed Defendants that the water running to their washing machine smelled like dirt.  When Defendants investigated, they found that the water line running to the house had been severed.

33.     Rather than replace the water line, Defendants hired their friend to reroute the line. This process took nearly three months and resulted in water leaks in the Residence.  Plaintiffs later learned that these water leaks created a condition for dangerous mold infestation in the Residence.

34.     Also in June 2016, Defendants began work to repair the roof of the Residence, which was in dire need of repair and later established by NY Licensed Mold Remediator, "Mr. Inside Out," as an entry vector for water that allowed for growth of toxic mold.  Again, Defendants hired their friend to complete this work.  It has since been learned that the roof was significantly over-insulated during the repair, allowing the attic to harbor excess moisture and create conditions for mold growth.

35.     Defendants did not seal the logs of the Residence in 2016 or the beginning of 2017. In May 2017, Defendants again represented to Plaintiffs via email that they intended to have the outside of the residence stained and sealed over the summer of 2017.  Such maintenance is required

to prevent the growth of toxic mold in the wood of a log cabin.  No such staining or sealing ever occurred during Plaintiff's tenancy.

36.     Due to the lack of maintenance, mold continued to grow and spread throughout 2017 and 2018.  Defendants visited the Residence personally during the summer of 2018, and noted orally to Plaintiffs that the basement smelled like mold and mildew.  However, Defendants failed and refused to take adequate measures to address the source of the dangerous mold growth. Plaintiffs continuously expressed concern about the potential health problems of mold infestation in the home.

37.     In or around September 2018, Plaintiffs sought medical care for their children for issues arising from the family's exposure to mold in the Residence.  These medical issues included: shortness of breath, chest tightness, cough, asthma, acute respiratory infections, chronic fatigue and the beginnings of permanent allergies.  Major Ashcraft and Ashley sought medical treatment for their children from Dr. Michael Yan, a pediatrician at Keller Army Community Hospital, who opined in a letter in January 2019 that their symptoms may be caused by mold. Many of these conditions continue to this day.

38.     In September 2018, Plaintiffs notified Defendants of their suspicion that the Residence was infested with toxic mold, as Plaintiffs' doctor, Dr. Michael Yan, had preliminarily linked a host of symptoms suffered by Plaintiffs and their children to mold exposure.  Defendants again promised to look into the mold infestation via text messages, and again failed to do so.

39.     In the interim, Plaintiffs took action on their own and contacted three remediators— Eco Green Solutions, Property Haven Solutions, and Tri State Restorations—who visited the property to provide estimates for mold remediation.  Plaintiffs provided Defendants with the quotes from all three remediators, but Defendants refused to hire any of them.

40.     In December 2018, following Defendants' continued inaction in regards to the mold infestation, Plaintiffs hired "Mr. Inside Out," a New York Licensed mold inspection and remediation firm, to inspect the Residence.

41.     In a letter to Plaintiffs on December 10, 2018, a representative from Mr. Inside Out identified exceptionally high levels of toxic mold in the Residence and listed a number of steps which would be required to make the Residence mold-free and fit for habitation.    The representative stated that personal protection must be worn for the duration of the remediation of the Residence.

42.     Throughout the duration of Plaintiffs' occupancy of the Residence, the logs were never stained or sealed, despite oral and written promises by Defendants to do so.  This treatment was necessary and consistent with industry standards for a log home.  The lack of proper repairs to the roof and water line contributed to and caused the mold infestation.

43.     In January 2019, Defendants finally took action towards the toxic mold infestation. However, instead of hiring a licensed professional, Defendants—who had no prior experience treating mold spores—took action by deploying an ozone device in the home while Plaintiffs' belongings remained inside even though EcoGreen Solutions, a licensed mold remediator, had advised Defendants against the use of an ozone device in an email dated December 20, 2018.

44.     During this period, Plaintiffs and their minor children were forced to evacuate the Residence due to the mold infesting the Residence and accompanying health problems caused by the mold.  They were constructively evicted from the Residence and forced to find temporary housing.

45.     The ozone device negligently deployed by Defendants did little more than disturb the mold spores infesting the residence, which led to further contamination of Plaintiffs'

belongings, and fell far short of the professional efforts required to rid the Residence of toxic mold, as demonstrated by, among other things, licensed mold remediator EcoGreen Solutions' warning to Defendants not to use the device. The result was near total destruction of all Plaintiff's belongings still located in the Residence.

46.     Due to the abrupt displacement from their home, Plaintiffs had to seek temporary lodging with friends and family, and incurred significant out-of-pocket expenses to replace their common goods, such as clothing, undergarments, and socks, which all had to be left behind in the infested Residence and eventually had to be discarded.

47.     Upon the recommendation of medical professionals and licensed mold inspectors, the family discarded all personal belongings that could not be effectively remediated. Plaintiffs were forced to dispose of in excess of $50,000 of contaminated personal property and furniture, including in excess of $3,000 worth of military-issued clothing and equipment.

48.     Plaintiffs and their children have been treated and are still under the care of physicians for severe mold-related ailments, resulting in tens of thousands of dollars in medical expenses to date and hundreds of thousands more likely to come in the future.

## COUNT ONE
### (Violation of the Servicemembers Civil Relief Act)

49.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 above as if fully set forth herein.

50.     A primary purpose of the Servicemembers Civil Relief Act ("SCRA") is "to provide for, strengthen, and expedite the national defense through protection extended by [the SCRA] to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. § 3902(1).

51.     The SCRA prohibits a landlord from evicting an active duty servicemember or their dependents from a residence without court order.  *See* 50 U.S.C. § 3951.

52.     Defendants intentionally failed to repair or eliminate the dangerous conditions in the Residence, as described above.

53.     As a direct result, Plaintiff Major Ashcraft, a servicemember, was forced to vacate the Residence along with his wife and his dependents.

54.     Defendants' actions and inactions constitute constructive eviction by the Defendants, in violation of 50 U.S.C. § 3951(a).

55.     Defendants failed to obtain a court order evicting Plaintiff from the Residence.

56.     Plaintiffs sustained tens of thousands of dollars in damages.

57.     Plaintiffs are entitled to their reasonable costs, consequential and punitive damages, and attorney's fees as a result of Defendants' deliberate actions and inactions, including violation of the SCRA.

## COUNT TWO
### (Negligence)

58.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 above as if fully set forth herein.

59.     Defendants had a statutory duty to provide a livable, safe, and clean residence to Plaintiffs.  *See* NY Real Prop L § 235-B (2015).

60.     Defendants willfully ignored and failed to timely and in good faith respond to the notification by Plaintiffs that the Residence had become infested with toxic mold.

61.     Defendants performed or caused to be performed, services that were substandard and failed to perform required services in direct contravention to the terms of the lease and best practices under the circumstances, purely to avoid the costs associated with the proper and

adequate maintenance of the Residence.  Such failures include failure to properly replace or repair the Residence's plumbing, failure to properly repair the Residence's roof, and failure to stain and seal the Residence's exterior in breach of the warranty of habitability.

62.    Solely as a result of the aforesaid actions and inactions of Defendants, the Residence became contaminated with toxic mold, causing severe personal injuries to Plaintiffs and their children residing therein, and forcing Plaintiffs to abandon their home, as it became uninhabitable, and seek medical care for their injuries and illnesses.

63.    Solely as a result of the aforesaid actions and negligence of Defendants, Plaintiff Major Ashcraft has sustained serious personal injuries, including but not limited to asthma, obstructed airway/lung disease, and chronic obstructive pulmonary disease.  When examined by Dr. Eckardt Johanning in 2019, the doctor noted typical fungal markers for people who had been exposed to mold.  Plaintiff Major Ashcraft has experienced pain and suffering and expended thousands of dollars for his medical care and treatment related to these injuries.  If Major Ashcraft's asthma persists, he will no longer be able to serve in the military.

64.    Solely as a result of the aforesaid actions and negligence of Defendants, Plaintiff Ashley Ashcraft has sustained serious personal injuries, including pain in her throat and chest, sinus and chest infections, nausea, disorders of vestibular function, visual disturbances, dizziness, acute pharyngitis, chronic rhinitis, abnormal hair loss, and fatigue.  In April 2019, Dr. Eckardt Johanning examined Plaintiff Ashley Ashcraft and noted typical fungal markers for people who had been exposed to mold—linking her illnesses to unsanitary conditions at the Residence, including water damage and mold.  Plaintiff Ashley Ashcraft has experienced pain and suffering and expended thousands of dollars for her medical care and treatment related to these injuries.

65.     Solely as a result of the aforesaid actions and negligence of Defendants, Plaintiffs' seven-year-old child, A.A., has sustained serious personal injuries including pain in A.A.'s throat, joints, and chest, frequent headaches, excessive fatigue, and multiple instances of acute upper respiratory infections and acute pharyngitis.  In April 2019, Dr. Eckardt Johanning examined A.A. and said A.A.'s illnesses were triggered or exacerbated due to the unsanitary conditions at the Residence.  Dr. Johanning added that A.A.'s suffering seems to be of a long-term nature. Moreover, the results from A.A.'s pulmonary function test in May 2019 shows baseline air trapping in A.A.'s lungs, an abnormal retention of air in the lungs caused by obstruction, resulting in difficulty breathing.

66.     Solely as a result of the aforesaid actions and negligence of Defendants, Plaintiffs' four-year-old child, L.A., has sustained serious personal injuries including joint pain, sleep disorders, muscle disorders, facial nerve disorders, digestive complications, chronic fatigue, visual disturbances, asthma, and reactive airway disease.  L.A. also suffers from neurological damage, including psychiatric symptoms, anxiety, and depression.  Multiple doctors found that mold exposure in the Residence triggered and exacerbated the L.A.'s symptoms.

67.     Solely as a result of the aforesaid actions and negligence of Defendants, Plaintiffs' two-year-old child, I.A., has sustained serious personal injuries including fevers, acute upper respiratory infections, rashes, congenital malformations of her larynx, vasomotor and allergic rhinitis, and hyperinflation of the lungs due to reactive airway disease.  Dr. Eckardt Johanning opined that these illnesses were linked to unsanitary conditions at the Residence, including water damage and mold.

68.     Plaintiffs have suffered tens of thousands of dollars in damages related to their deteriorating and ongoing medical conditions. Specifically, they have been forced to seek medical

care outside of the military service providers and incurred tens of thousands in out-of-pocket medical expenses. In addition, Plaintiffs have informed Tricare of their damages and expect Tricare to seek to receive a portion of any recovery made by Plaintiffs.

69.     Plaintiffs will continue to incur tens of thousands of dollars of damages as a result of their need to provide medical care to themselves and their minor children.

## COUNT THREE
### (Gross Negligence)

70.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 above as if fully set forth herein.

71.     Defendants knew or should have known that their negligence would have harsh consequences for the Plaintiffs but recklessly disregarded and were indifferent to those consequences.

72.     Defendants failed to use even reasonable care and showed complete disregard for the rights and safety of Plaintiffs.

73.     For example, Defendants knew that only licensed mold remediators were capable of rectifying the hazards in the Residence, yet chose to employ a device on their own that directly worsened the hazards to Plaintiffs and contributed further to the destruction of their property.

74.     Defendants' knowledge of the consequences of their negligence and their reckless disregard of this knowledge through their failure to take any appropriate action constitutes gross negligence, for which Plaintiffs are entitled to damages in the tens of thousands of dollars.

## COUNT FOUR
### (Breach of Contract)

75.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 above as if fully set forth herein.

76.     Plaintiffs and Defendants entered into a binding contract in the form of the leasing of the Residence on June 16, 2016.

77.     Plaintiffs fully performed all obligations under the contract, including paying a security deposit and rent in a timely fashion.

78.     Defendants failed to uphold their obligations under the contract, including their obligation to provide Plaintiffs with a habitable dwelling, resulting in the aforementioned harm in the form of severe illnesses and damaged personal property.

79.     Plaintiffs are entitled to a return of their deposit paid as security and for refund of their rent during the periods of uninhabitability for an amount not less than tens of thousands of dollars.

80.     Plaintiffs are additionally entitled to all compensatory and consequential damages resulting from Defendant's breach of contract, including damages related to the deterioration of Plaintiffs' health, loss of personal property and all costs sustained when relocating from the uninhabitable Residence, in an amount not less than tens of thousands of dollars.

## COUNT FIVE
### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealings)

81.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 above as if fully set forth herein.

82.     Plaintiffs relied on Defendants to carry out their contractual duties honestly and in good faith, and where thus victimized by Defendants' aforementioned misconduct.

83.     In forcing Plaintiffs to live in uninhabitable conditions before constructively evicting them from their home, Defendants have injured Plaintiffs' rights to receive the full fruits of their contract and thereby breached the implied covenant of good faith and fair dealing.

84.     Plaintiffs are entitled to a return of rents paid and damages in the tens of thousands of dollars.

## COUNT SIX
### (Intentional Infliction of Emotional Distress)

85.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 above as if fully set forth herein.

86.     Through the above conduct, Defendants intentionally allowed toxic mold to spread through the Residence, leading to mold-related illnesses for Plaintiffs and their three young children, loss of Plaintiffs' property, and an inability to live in the Residence that forced Plaintiffs and their children to seek shelter elsewhere as they attempted to deal with potentially lifelong ramifications of their mold-related illnesses.

87.     Such conduct is outrageous, atrocious, extreme beyond all bounds of decency, and utterly intolerable in a civilized community.

88.     Defendants' actions and inactions show a clear disregard for the substantial probability that their misconduct would, and indeed did, result in all aforementioned harms to Plaintiffs and their children.

89.     Defendants' extreme and outrageous conduct has caused potentially lifelong illnesses, and this stress is further compounded by Plaintiffs' distress over their medical bills and their fear for the long-term health of their children, as well as distress over witnessing the effects of the mold-related illnesses on their children.

90.     From this, Plaintiffs have suffered severe emotional distress for which they are entitled to recover damages in the tens of thousands of dollars.

## COUNT SEVEN
### (Negligent Infliction of Emotional Distress)

91.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 to 48 and paragraphs 85 to 90 above as if fully set forth herein.

92.     Defendants' aforementioned extreme and outrageous conduct not only constitutes a clear breach of Defendants' duties to Plaintiffs, but such breach also endangered the physical safety of Plaintiffs and their children and caused every member of the Ashcraft family to fear for their own physical safety.

93.     From this, Plaintiffs are entitled to recover damages in the tens of thousands of dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for an Order and Judgment:

94.     Awarding Plaintiff compensatory and punitive damages in amounts to be determined at trial;

95.     Awarding Plaintiff pre-judgment and post-judgment interest;

96.     Awarding Plaintiff its reasonable costs and expenses incurred in this action; and

97.     Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
       December 17, 2019

Respectfully submitted,

Joseph V. Moreno
Todd Blanche
J. Robert Duncan III
Hyungjoo Han
Marshall Jones (application for *pro hac vice*
forthcoming)
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Fax: (212) 504-6666
Joseph.Moreno@cwt.com
Todd.Blanche@cwt.com
Robert.Duncan@cwt.com
Hyungjoo.Han@cwt.com
Marshall.Jones@cwt.com

*Attorneys for Plaintiffs Timothy and Ashley Ashcraft
and A.A., L.A., and I.A.*